### E. HOBART & COMPANY *vs.* LITTLEFIELD BROTHERS.

M., a cotton broker in Providence, Rhode Island, at the request of L., telegraphed January 19, to H., a commission merchant in Galveston, Texas, "L. offers 13½ f. o. b. and freight for fifty bales; fill part if can't whole;" "f. o. b." meant free on board.

January 21 the offer was accepted. January 24 the cotton was carried to the steamer's dock and a bill of lading was given January 26. The invoice described the cotton as "bought by H. by order of M. for account and risk of L."

The parties had before had similar dealings.

Part of the cotton was embarked, and the rest was burned on the dock January 29.

The steamer arrived at the dock January 24, and did not have time to discharge and reload its freight before the fire.

In an action by H. against L. to recover the price of the cotton burned :

*Held,* that the delivery to L. was complete and that H. should recover.

ASSUMPSIT. Heard by the court, jury trial being waived.

*July* 8, 1881. POTTER, J. This is an action on the case, and the declaration contains counts for goods sold and delivered, for goods bargained and sold, and the usual money counts. One of the defendant firm, residing in Providence, January 19, 1880, called on J. Morgan, a cotton broker in that city, and at defendants' request, Morgan telegraphed to the plaintiffs, residing in Galveston, Texas, " Littlefield offers 13½ f. o. b. and freight for fifty bales ; fill part if can't whole." If it could be obtained for less the defendants were to have the benefit of it. Commissions, and all expenses except insurance, were to be included in this limit. The defendants did not insure. The parties had had similar dealings before.

The plaintiffs answered they could not fill the order then, but could in a day or two, and January 21 they telegraphed and wrote to Morgan to accept defendants' offer, that they could buy it, &c. Durfee, one of the plaintiff firm, testified that they could not fill the order before the 21st, that the cotton was drayed to the dock on the 24th, and a bill of lading given the 26th. January 27th the plaintiffs wrote defendants, notifying them of the purchase, and enclosing an invoice of        bales of cotton, bought by Morgan

for account and risk of defendants. On the 29th a part of the cotton was burnt on the dock, and this has led to the present suit. The steamer arrived at Galveston on the 24th, and had a large freight to discharge and to take in. The arriving freight was not all discharged, and only six bales of the cotton had been actually put on board when the fire took place.

The rules governing cases of this sort are plain, though not always easy of application. In general, a delivery of goods to a common carrier, and a fortiori, to one specially designated by the buyer, is a delivery to the buyer. Unless the seller has contracted to deliver them to the buyer at some particular place or in some particular manner, everything the seller has to do concerning delivery is then completed. Benjamin on Sales, 2d Eng. ed. 181 ; Ludlow v. Bowne, 1 Johns. Rep. 1, 15 ; Dunlop v. Lambert, 6 Cl. & Fin. 600, 620 ; 2 Kent Comment. *492, *494, *499 ; Garland v. Lane, 46 N. H. 245, 248 ; Hunter v. Wright, 12 Allen, 548.

Although the risk generally goes with the title or ownership, it does not always. See Gabarron v. Kreeft, 24 W. R. 146. Nor is the invoice conclusive. Shepherd v. Harrison, L. R. 5 H. L. 116, 129. But all the facts are to be considered so as to get at the intention of the parties, for it is that which governs.

In the present case the goods were delivered at the steamer's wharf. They were to be sent by steamer and there was but one line. That the officers of the vessel knew of their delivery on the wharf is evident from the fact that a part of the bales had been loaded. There was no need of any formal receipt or acceptance to bind the carriers. As common carriers, it was their duty by law to receive and carry them, if they had the means so to do.

Unless by some agreement, those who bring freight to a vessel are not expected or permitted to load it themselves. What amounts to a delivery to carriers may sometimes be a question of fact for a jury; ordinarily, delivery at their wharf, freight house, or warehouse, and bringing it to the notice of the servants of the carriers, would be so considered. A delivery at a wharf may be of itself an incomplete act, to be explained by what has preceded it or by what takes place subsequently. 1 Parsons on Shipping and Admiralty, 183. The M. K. Rawley, 2 Lowell's Decis. 447 ; British

*Columbia Sawmill Co.* v. *Nettleship*, L. R. 3 C. P. 499, 502; *Packard* v. *Getman*, 6 Cow. 757; *Railroad Co.* v. *Barrett*, 36 Ohio St. 448.

No one would contend that if the cotton had been merely delivered on the wharf, and no information given to the master or his servants of the purpose for which it was delivered, he could be considered as having received it, either so as to bind his owners or as agent of the buyer.

When we are looking for decisions as to what constitutes delivery to the buyer, the question is apt to be confused by not distinguishing it from the receipt and acceptance required by the statute of frauds. That statute 29 Charles II. cap. 3, § 17, in force in England and in many of our States, requires in all sales of goods over a certain amount, where there is no memorandum in writing, that the buyer shall accept and actually receive a part of the goods, or shall give something in earnest to bind the bargain.

But in the present case the contract was in writing, and the question of receipt and acceptance cannot arise. And that provision was never in force in Texas, where the old Spanish law prevailed. Only one provision of the English statute, and that not affecting the present case, was enacted there in 1840. See Browne on Frauds; and this § 17 of the English statute was omitted from our Digest of Laws in 1798, and has never been reënacted in Rhode Island since.

But the offer was made and accepted in Texas; and if there is any difference of laws, the contract would be governed by the laws of Texas. But the principles of the common law as to sale and delivery of goods have been substantially adopted there. And we are to presume their law of contracts, &c., to be the same as our own until the contrary is shown. Wharton on Conflict of Laws, § 780.

These remarks in relation to the statute of frauds are made because in States where it is in force much stricter evidence of receipt and acceptance by the buyer or his agent is required. And they are necessary in order to guard against misunderstanding many of the decisions; *e. g.* a common carrier is the agent of the buyer for receiving the goods, but he is not the agent of the buyer for the purpose of accepting them in order to make a sale binding under that statute. Benjamin on Sales, Amer. ed. § 181.

Such being the general rules, and the cotton having been delivered in the manner we have stated, are there any facts in the present case which would prevent the title with the risk passing to the defendants, the buyers?

The defendants' offer, which was accepted and filled by the plaintiffs, was for fifty bales or less at 13½ "f. o. b. and freight." That f. o. b. means *free on board* is not disputed. But the defendants contend that the proper construction is that the goods were not to be theirs until actually put on board, and the question is whether the words refer to anything which was a condition of delivery or whether they merely refer to and designate what part of the expenses the vendors were to pay. One of the plaintiffs and another witness from Galveston, the market where the cotton was bought, testify that they understood that the words f. o. b. merely meant that they were to pay all expenses up to the time of delivery on board, and we are of opinion that that is the natural and reasonable construction; and the fact that "f. o. b. and freight" meant that the vendor was to pay all expenses to Providence is further proof that the words "f. o. b." alone referred only to who should pay expenses, and had nothing to do with the time or mode of delivery.

Some of the dealers in Providence understood the words in the same manner as the Galveston witness, while some understood them as implying that the goods were actually to be put on board by the sellers.

If words have a settled meaning by the usage of the market where the goods were bought, then it is of no consequence how they are understood elsewhere. Whoever sends to a foreign market is, in the absence of special provision, presumed to mean to deal according to the usages of that market. But we do not rest our opinion upon this rule of law, but upon the plain meaning and construction of the words.

But even if the words were of uncertain meaning, we should apply the rule that when a person gives an order to an agent or other person abroad in such uncertain terms as to be susceptible of two different meanings, and the person *bonâ fide* adopts one of them and acts upon it, the principal cannot repudiate the act merely because he meant it to be read in the other sense. *Ireland* v. *Livingston*, L. R. 5 H. L. 395, 416.

But it is contended that the master has no right to sign a bill of lading for the cotton until it is actually on board, and if he does, it does not bind the owners, and an argument is drawn from this as to what must have been the intention of the parties in the present case. But the cases to which we are referred are cases where it amounted to actual fraud; in one case, *Schooner Freeman* v. *Buckingham et al.* 18 How. U. S. 182, the goods had no existence; in another they were still in the warehouse of another party. See Abbott on Shipping, 323; *Rowley* v. *Bigelow*, 12 Pick. 307, 314; *Grant* v. *Norway*, 10 C. B. 665.

But here the question is not whether the owners are bound for the loss, but whether there was such a delivery to the carriers as, there being no other circumstances inconsistent, would pass the title and risk. Mr. Metcalf, of Galveston, and others, testify that the goods were considered on board when they were brought to the ship's tackle, and Mr. Littlefield says Mr. Morgan told him it was so understood. Evidence is also given that it was the custom there for the steamer, on being notified that goods were ready, to send its own drays for them, and we may therefore infer that it was done in this case. The goods were then put completely in the power of the master, and we cannot conceive of more complete delivery. Although not necessary, there could be no wrong in his acknowledging that fact by any proper writing.

The invoice in the present case expressed the goods to be at the risk of the defendants. In their previous dealings, the form of the invoice had been the same. We think therefore there can be no doubt on this point.

The fact that the vendor was to pay freight has little or no bearing on the question, as, by the bargain which was made, the plaintiffs were to obtain the cotton for so much, all expenses except insurance included, and for less if they could. If the defendants had been obliged to pay any of these expenses, they could claim to have them deducted from the price on settlement.

But it was stated, although not pressed, that the bill of lading, with a blank indorsement, was attached to a sight draft and sent by the plaintiffs to a bank, as their agent, to collect the one and deliver the other, and that the property was still in the plaintiffs' control, and that therefore they cannot recover.

It would not at all follow, even if the goods were in the plaintiffs' control, that the title and the risk were not in and on the defendants.

It was perfectly competent for the parties to have provided that neither the title, risk, nor possession should pass, or, that the title and risk passing, the possession should not pass until the goods reached the destination and were paid for. The reserving this latter right, or *jus disponendi*, as it is called, has been the subject of many decisions not always consistent.

But all the cases on the subject hold that this is a question of intention, to be gathered from the facts. If a bill of lading is taken to the order of the buyer, it would undoubtedly be taken as evidence of passing both title and possession. If it is taken to the shipper, and his order, it would be taken as *primâ facie* evidence that, although the title may have passed, he intended to keep the goods in his possession and control, and not to actually deliver them until they were paid for or until some condition was complied with. Benjamin on Sales, Amer. ed. §§ 381, 399, 2d Eng. ed. §§ 288, 305.

In any sale of goods, without any stipulation for credit, the title may pass, if the facts show that such is the intention of the parties, although they remain in the vendor's possession; and in such case he has a lien on them for the price, and may retain them until paid. Story on Sales, § 282 *a*; Bateman on Commercial Law, §§ 189, 256; *Barrett* v. *Goddard*, 3 Mason, 107; *Hatch* v. *Oil Company*, 10 Otto, 124.

So in the present case the title might pass on the completion of the bargain, and the selection and appropriation of the cotton to that purpose, in such a manner that the goods would be at the buyer's risk and yet the seller retain possession of them by himself or by the master, as his bailee and agent, until paid. If the retention of the bill of lading was merely to retain the possession of the cotton for this purpose, then the title and the risk belonged to the defendants.

And in this case the other facts all tend to show that the vendors at least considered that they had parted with the title and risk. The invoice, made out before the fire, was of cotton bought by E. Hobart & Co., by order of J. Morgan, Esq., " for account and risk of Messrs. Littlefield Bros."

The other invoices in previous dealings, and the parties had dealt in this way for years, had been similar.    All the evidence shows that the plaintiffs were a sort of commission merchants to purchase and fill orders as they were given.    They were to procure the cotton for a sum limited, and for less if possible, and to fill part of the order at that limit if they could not fill the whole. Their own profit was from a commission.    This, however, would not prevent their standing in the relation of vendors to the defendants.    The original owners sell to the commission merchant. Otherwise the defendants, instead of being liable to the plaintiffs, might be held liable to those of whom the plaintiffs bought.    See *Ireland* v. *Livingston*, L. R. 5 H. L. 395, 407, 408; Benjamin on Sales, Amer. ed. § 590.

If, therefore, the plaintiffs bought the cotton at the request of the defendants, to be forwarded to the defendants, and were ready to forward and deliver it, and the facts show, as we think they do, that not only the title was in the defendants, but the risk also was on them, then the plaintiffs are entitled to recover for the cotton burned, even if they did for their own security retain the bill of lading under their own control.    Judgment must therefore be given for the plaintiffs.

*Judgment for plaintiffs for $2,057.07 and costs.*

*Edward C. Ames & Samuel Ames*, for plaintiffs.

*Tillinghast & Ely*, for defendants.